70 Cal.2d 200 (1969)
In re ROBERT A. BRANCH on Habeas Corpus.
Crim. No. 11483. 
Supreme Court of California. In Bank. 
Jan. 21, 1969.
 Robert A. Branch, in pro. per., Thomas W. Bell, Jr., under appointment by the Supreme Court, and MacDonell, Bell & Sandberg for Petitioner.
 Thomas C. Lynch, Attorney General, Roger E. Venturi, Edward A. Hinz, Jr., and Daniel J. Kremer, Deputy Attorneys General, for Respondent.
 PETERS, J.
 This petition involves petitioner's claim of inadequacy of his representation in that his counsel failed to investigate his claim that prior to or during the trial he had told his counsel that he had information that other named convicts had committed the offense with which he was charged. Based on the entire record, we find that petitioner did not tell his counsel of these facts prior to or during the trial, and that the information given the attorney just prior to sentence was given under such circumstances that the attorney reasonably believed the testimony would be perjured. We also find that the attorney acted reasonably in not further investigating the claimed facts, and that under the record, we should not find that petitioner is innocent.
 The problem arises under the following circumstances:
 In August 1961, when petitioner was 18 years old, authorities *203 found two knives in the cell in which he was imprisoned at Soledad Correctional Training Facility. On January 5, 1962, he was sentenced for violating Penal Code, section 4502 (possession of a deadly weapon by a prisoner) after conviction by a jury. On February 2, 1966, this court denied a prior habeas corpus petition alleging denial of the rights set forth in Escobedo v. Illinois (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758]. On March 8, 1967, we denied a petition for hearing after the Court of Appeal on motion of the Attorney General dismissed petitioner's appeal from an order denying a petition for coram nobis based on facts quite similar to those herein alleged.
 Upon the filing of the instant petition for writ of habeas corpus, we issued an order to show cause and appointed counsel for petitioner. We also appointed a referee to hold an evidentiary hearing on certain questions of fact bearing upon petitioner's request for relief. The Attorney General has filed a brief in which he raises objections and exceptions to the referee's report.
 The claim in the present petition, as already pointed out, is that petitioner is entitled to habeas corpus relief on the ground that his trial counsel failed to investigate a possible defense--the alleged willingness of two other prisoners to admit that they were responsible for the knives being in petitioner's cell--and that this failure denied him the effective assistance of counsel to which he was constitutionally entitled. On the basis of a confession of another to the crime he urges that he is innocent. The pertinent facts, based in part on findings of the referee, [fn. 1] are as follows:
 At petitioner's trial, Correctional Officer Ed Leonard testified that when he "shook down" petitioner's cell on August 28, 1961, he found two knives concealed therein.paul Rendleman, captain of the officers at Soledad at this time, testified that he ordered the search of Branch's cell in connection with a fight which had occurred near his cell the previous day. He *204 had reports that Branch was seen at or near the fight scene, that a knife had been seen by an officer who broke up the fight, and that it was Branch who had the knife that was seen. Captain Rendleman further testified that he talked with Branch in his office after the knives were found, that Branch admitted to him that the knives belonged to him, that he had made them with a piece of file, and that he liked having knives under his pillow (where one of the two was found) as he always had outside prison.
 Branch thereafter testified at trial on August 28 that he had had no knives, knew of none in his cell, never saw the knives in question until the preliminary hearing, and never had a file. When asked on cross-examination whether he knew of any reason why Officer Leonard or Captain Rendleman might lie about him, he stated "No, sir, but I can prove that they have told false up here. ... if I had the opportunity." [fn. 2] Asked specifically if he could prove that Captain Rendleman was lying, Branch responded "That's right"; asked if he had evidence, he replied "Yes, I can bring people down here." When the court then ordered a short recess so that Branch could talk to his attorney, Mr. Rosendale, the attorney commented that he would appreciate a recess "so that I can talk to Mr. Branch and make sure that he understands and I understand him, and I can also ask him some questions what he's referring to, maybe with respect to collateral things."
 After the recess, Rosendale asked Branch on redirect: "Before the recess, Mr. Branch, you indicated that testimony concerning some items that Captain Rendleman made [sic] would be different from what you yourself would testify to or other people would testify to. With regard to that, did you have reference to the so-called fight that occurred the night before?" Branch answered, "That's what I meant, yes." Further questions by Rosendale elicited answers from Branch indicating that he had also been referring to Captain Rendleman's testimony regarding Branch's confinement, after the knives were discovered, in a "holding cell" and his treatment there. Under subsequent questioning by Rosendale, Branch stated that he had not told Captain Rendleman that he owned the knives; however, he did not testify that he knew *205 of any person who could corroborate his story by testifying that such person had planted the knives in Branch's cell without Branch's knowledge.
 The foregoing portions of testimony at petitioner's trial bear upon two crucial and interrelated questions regarding which this court ordered the referee to take evidence in connection with the habeas corpus petition. The first is what information, if any, did petitioner have prior to his conviction regarding the involvement of other inmates--and their identities--in placing knives in his cell? The second is what information relative to his own and others' involvement in placing knives in his cell did petitioner communicate to his trial attorney, Rosendale, and when? [fn. 3]
 The referee found that prior to his conviction in 1961 for violation of section 4502 of the Penal Code petitioner was informed that a fellow inmate known to him as "Tex" (and whose actual name was Carl H. Boggess) "would admit that he had placed the knives in the cell of petitioner without the latter's knowledge." In view of the evidence upon which this finding rests, it appears that if petitioner was so informed before his conviction, he was also informed prior to the trial itself. This finding is largely based on the testimony of petitioner and that of Boggess.
 Branch testified at the hearing that a few days after August 28, 1961, he was informed that Boggess would, as Branch put it, "clear this matter up" if Branch were taken to court. Boggess testified both that he did place the knives in petitioner's cell on August 28, 1961, [fn. 4] and that upon hearing that *206 Branch was being tried by the prison disciplinary committee for possession of the knives he (Boggess) "sent a message to him that if he were to be tried [in court] to notify me and I would cop to the plea." This latter aspect of Boggess' testimony was corroborated by the testimony of Wilburn Matthews, a trustee in the isolation area at Soledad on August 28, that he received on or about that date a message from Boggess, "[a] very good friend of mine," to the effect that "if Mr. Branch was called to court, he would straighten the situation up."
 Boggess also testified that about the same time he sent the message to Branch he told a guard and an "adjustment center counselor" at Soledad that he had placed the knives in Branch's cell. He claimed that the officer thought his story "was rather humorous and disregarded it" while the counselor "just ignored it more or less." Tending to undermine the validity of this testimony is the fact that on May 15, 1964, in an affidavit before a correctional counselor at San Quentin, Boggess stated that he had not told anyone of his involvement in the knives incident before coming to San Quentin State Prison, which was apparently well after petitioner was convicted and sentenced. [fn. 5]
 The primary evidence which arguably casts some doubt on the referee's first basic finding--that Branch knew prior to his conviction that Boggess would admit placing the knives in his cell--is the very evidence which the referee relied upon in making his second basic finding, that "It is not true, as contended by the petitioner, that he communicated this information to his attorney before or during the trial." Rather, "Following his trial and prior to the sentencing on January 5, 1962, the petitioner told his attorney he could get two fellow convicts to testify they had placed the knives in his cell."
 Rosendale, Branch's court-appointed attorney at trial, testified before the referee that prior to the trial Branch "indicated to me that the knives were his," that Branch told him *207 that he had told Captain Rendleman the knives were his, [fn. 6] and that Branch stated that he had sharpened one of the knives "on some rough concrete on, I believe, it was a floor of the machine shop." He further testified that he did not recall Branch making, before or during the trial, any reference to the existence of other inmates who were involved in placing the knives in his cell or who would testify to that effect. According to Rosendale, it was only after Branch was convicted that he "sought alternatives" and "indicated to me ... that he thought he could get a couple guys to come up and testify for him. It was obvious from the manner in which he discussed this ... [that] there was a favor that was going to be done for him by a couple of buddies. ... [T]here were no names mentioned, as I got the impression that he'd search around until he found a couple of people who would do what he wanted."
 Rosendale's testimony that Branch told him he made and owned the knives and admitted this to Captain Rendleman is corroborated by the testimony of Captain Rendleman at trial, already mentioned.
 On the issue of when Branch told Rosendale about inmates willing to testify they placed the knives in Branch's cell, Rosendale's testimony is contradicted by that of Branch. The latter testified before the referee as follows:
 "A. I had one message from a man upstairs by the name of Tex [Boggess], that he told me if I was taken to outside court to have my lawyer call him. He would straighten this matter up, him and another inmate. ..."
 "Q. [By Mr. Bell, appointed to represent Branch at the hearing] With regards to this information ... did you relay this to your attorney ... Mr. Rosendale?"
 "A. I told him, the first meeting [sometime before the preliminary examination] I told him this was an inmate upstairs named Tex, he would find out who it was, he would ask the officer who it was, that he would clear this matter up. If I was called in court would you talk to him? ..."
 "Q. Do you recall what Mr. Rosendale's reply was, if any?"
 "A. Yes. He told me that, first place, that the convict wasn't good to call a convict up in a case coming off the penitentiary. Especially, I told him that Tex was a Mexican. I was under the impression he was. He told me the jury would *208 be prejudiced against any Mexican's testifying for me, plus the fact they were convicts."
 "Q. Was his advice to you, as you recall, not to call these--this fellow by the name of Tex?"
 "A. More or less refused, because it would hurt me more than help me, in his estimation."
 "Q. This was his decision? At least this was his advice?"
 "A. Yes."
 Supporting Branch's testimony regarding when he told Rosendale about Boggess and Rosendale's response is the testimony of Wilburn Matthews, the Soledad trustee, who testified as follows:
 "Q. [By Mr. Bell] Did Mr. Branch indicate to you [while the two were in the Soledad isolation area prior to Branch's trial] whether or not he had asked his lawyer to bring Tex in to testify?"
 "A. Yes. He did. He told me that he talked it over with his lawyer, but his lawyer didn't feel that it was necessary. So then I asked Mr. Branch to find himself a new lawyer. ... [But] He just wanted to go along with the officials, go along with whatever the personnel are going to say. Therefore, this is what he did [apparently referring to the fact that Branch did not get a new lawyer]."
 Petitioner also seeks to discredit Rosendale's testimony by attacking his ability to recall, if not his veracity.petitioner points out in his traverse to respondent's objections and exceptions to referee's report that Rosendale admitted having no notes of his first meeting with Branch [fn. 7] and no notes referring to any conversation with Branch regarding "witnesses among the inmates to this ... offense. ..." Furthermore, petitioner points out that at one point Rosendale erroneously stated that he recalled sentencing occurred on December 4, 1961, when in fact it occurred on January 5, 1962. Rosendale testified that "I believe it was at that time" that Branch first told him of the existence of inmates willing to take the blame. It should be pointed out that December 4, 1961, was a date to be remembered because it was the date that Branch was recommitted to the California Youth Authority following his November 29, 1961, conviction. Moreover, in view of the date of conviction, Rosendale's erroneous recollection of the date of sentencing does not affect his claim that it was not until *209 after conviction that Branch told him about other inmates willing to take the blame.
 That portion of the proceedings at trial wherein Branch commented that he could "bring people down here" to prove that prison officials "have told false ... if I had the opportunity" (already quoted) also bears upon Rosendale's allegations. This incident is consistent with Rosendale's claim that he knew nothing of any inmates willing to take the blame during the trial. First, when the district attorney told Branch "Well, you have the opportunity. ... You're in court, prove it," he replied "You lock me up all day. I can prove it." Thus, it does not appear from Branch's in-court statement that he then claimed that any failure to produce additional witnesses was due to any disagreement with his attorney over strategy as to new claims. Second, subsequent questioning of Branch elicited statements that he had been referring to witnesses who would contradict Captain Rendleman's accounts of the fight the night before the knives were discovered and Branch's subsequent treatment in a "holding cell." Third, at the hearing Rosendale testified that when he met with Branch during the recess following Branch's remarks about other witnesses they may also have discussed Branch's frequent assertion to Rosendale that other unidentified officers had been present in Rendleman's office when Branch was questioned and could corroborate Branch's version of what he told Rendleman there.
 The referee further found that after the trial and prior to sentencing, Rosendale, "believing that any such testimony [i.e., testimony of inmates that they placed the knives in Branch's cell] would be perjured, refused to represent the petitioner further. He did not investigate this information nor move for a new trial, nor file a notice of appeal. He advised the petitioner to get other counsel and told him he had a limited time to appeal." This finding rests largely on the following testimony by Rosendale:
 "I indicated to him he should get himself other counsel, let other counsel who did not have the background information of this case that I had make [sic] up their own mind [sic] what they would do with information that he would give them. ... I indicated that he could request a new trial on the grounds of newly discovered evidence, or, he could move for appeal ... wherever he would be sent to. ..."
 "Q. Did you indicate to him that he had ten days in which to file a Notice of Appeal? *210 "
 "A. ... I don't know whether I told him ten days or not. I told him he had a very short time to file. ..."
 "After the sentencing, I indicated to him that if he wanted to pursue the matter any further that I gave [sic--would give?] him what information I felt was necessary to assist him in doing that. ... I don't know what he did. ... [H]e didn't know what he wanted to do at that point."
 The referee made no recommendation to this court regarding the granting of relief beyond stating that "petitioner should not be faulted for his delay in seeking relief on the ground asserted in this application" since "[t]his delay can be attributed to his youth and his ignorance, [and] also to his dependence on jail house lawyers who [gave him bad advice]."
 The primary issue presented by the instant petition for writ of habeas corpus is whether petitioner, Branch, at his trial was denied effective assistance of counsel. [1] The constitutional right to counsel contemplates "effective aid in the preparation and trial of the case." (Powell v. Alabama, 287 U.S. 45, 71 [77 L.Ed. 158, 53 S.Ct. 55, 84 A.L.R. 527]; People v. Ibarra, 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) [2] Where such aid is denied the question may be raised by a petition for habeas corpus. (In re Beaty, 64 Cal.2d 760, 761 [51 Cal.Rptr. 521, 414 P.2d 817]; In re Rose, 62 Cal.2d 384, 385-386 [42 Cal.Rptr. 236, 398 P.2d 428].)
 [3] An attorney who represents a criminal defendant owes to his client a duty to investigate carefully crucial defenses of fact that may be available. (People v. Ibarra, supra, 60 Cal.2d 460, 464; see In re Smiley, 66 Cal.2d 606, 626 [58 Cal.Rptr. 579, 427 P.2d 179].) The attorney's inexcusable failure to do so constitutes a denial of effective assistance of counsel (People v. Ibarra, supra; see In re Smiley, supra) and therefore of a fair trial (cf. Brubaker v. Dickson, 310 F.2d 30, 38-39, cited with approval in People v. Ibarra, supra). [4] On the other hand, an attorney owes no duty to offer on his client's behalf testimony which is untrue. (People v. Pike, 58 Cal.2d 70, 97 [22 Cal.Rptr. 664, 372 P.2d 656]; People v. Davis, 48 Cal.2d 241, 256-257 [309 P.2d 1]; cf. In re Atchley, supra, 48 Cal.2d 408, 418-419.) In People v. Pike, supra, we held that an attorney may not "knowingly allow a witness to testify falsely" (58 Cal.2d at p. 97), noting that of course a person can only be said to "allow" that which he has the power to prevent (id., fn. 20). [5] An attorney who attempts to benefit his client through the use of perjured testimony may be subject to criminal prosecution *211 (Pen. Code, 127) as well as severe disciplinary action (In re Jones, 208 Cal. 240, 242 [280 P. 964]).
 [6] Under the circumstances we conclude that petitioner was not denied effective assistance of counsel. This conclusion is based upon an acceptance of Rosendale's testimony at the referee's hearing as true. The referee found (1) that petitioner did not tell Rosendale before or during the trial about any fellow inmate willing to testify that he put the knives in petitioner's cell, and (2) that when petitioner did give Rosendale this information prior to sentencing the latter refused to investigate or act upon it because he believed such testimony would be perjured. Thus, the referee obviously believed Rosendale's testimony on these questions and disbelieved petitioner's contrary testimony. The other evidence bearing on these questions is both circumstantial and inconclusive. [fn. 8] Therefore, their resolution depends largely on credibility, and we should--in view of the referee's "opportunity to observe the demeanor of the witnesses and weigh their statements in connection with their manner on the stand" (In re Atchley, supra, 48 Cal.2d 408, 411)--accept the referee's findings in the absence of substantial countervailing considerations. (Cf. In re Rose, supra, 62 Cal.2d 384, 387-389 [referee's findings, indicating that referee did not believe attorney's testimony, were "directly contrary to the evidence" (62 Cal.2d at p. 389)].)
 From Rosendale's testimony it appears that he had good reason to believe the testimony which petitioner offered to procure after his conviction would be perjured and that he justifiably refused to act upon the information he was given. In In re Atchley, supra, 48 Cal.2d 408, 419, we held that despite the attorney's refusal to call two witnesses who the defendant said could exculpate him, there was no deprivation of the right to effective aid of counsel. In that case the defendant claimed that the shootings which eventually resulted in his conviction of first degree murder and assault *212 with a deadly weapon with intent to commit murder were committed in self-defense. He told the public defender who had been appointed to represent him at trial that Onis Belt and James Morse observed the shootings and would testify to circumstances showing self-defense. Although we did not specifically refer to this factor as being crucial to our holding, our statement of facts shows that the attorney, who was skeptical of these witnesses from the outset, did not finally refuse to call them (despite his client's protests) until he not only interviewed them himself but had the sheriff investigate their claim that they observed the shootings. Having investigated the defensive evidence his client brought to his attention, the attorney was even more thoroughly convinced that the suggested witnesses would be "torn to shreds" on cross- examination (48 Cal.2d at p. 416) and that their testimony on behalf of the defendant might well cause the defendant to receive the death penalty.
 Even if we had explicitly predicated our holding in Atchley on the attorney's investigative efforts prior to finally refusing the evidence his client profferred, the instant case would be distinguishable. In Atchley petitioner told his attorney about Belt and Morse and the testimony they would give before the trial had commenced. (48 Cal.2d at p. 416.) Moreover, although "petitioner on various occasions changed materially the substance of his stories to the public defender" about shots he allegedly fired outside the ranch house apparently prior to the shootings inside the ranch house for which conviction was sought (id), there was apparently nothing in petitioner's previous conversations with his attorney or in his remarks about Onis and Belt (or the context in which these remarks were made) which in itself suggested that the proffered testimony would be perjured.
 By contrast, in the instant case, according to Rosendale, it was only after trial that petitioner told Rosendale that "he thought he could get a couple guys to come up and testify for him" and "there were no names mentioned, ..." Moreover, according to Rosendale, petitioner's own prior admissions to Rosendale that he owned the knives and the tone of his belated reference to inmates who would testify for him strongly indicated that he was, in desperation, offering to secure perjured testimony in order to get his conviction set aside. Therefore, the circumstances of this case are such that Rosendale appears to have been justified in refusing to act upon the profferred testimony without even investigating its *213 veracity. Furthermore, if petitioner did not mention any specific inmates' names to Rosendale, as Rosendale alleges he did not, there was not much investigating Rosendale could do.petitioner can hardly claim that Rosendale's immediate refusal to consider using the testimony petitioner vaguely offered to procure deterred petitioner from getting specific names or giving them to Rosendale if, as the referee found, he already knew at least one, that of "Tex" Boggess.
 Although Rosendale refused to act upon the information petitioner gave him between conviction and sentencing it does not appear that Rosendale at that point "refused to represent the petitioner further" as the referee found. The abstract of judgment indicates that petitioner was in court "with his counxel [sic--counsel], John C. Rosendale" when the former was sentenced on January 5, 1962. Moreover, Rosendale's testimony at the referee's hearing indicates that he continued to represent petitioner until he was sentenced.
 [7] Once petitioner was sentenced, Rosendale was free to withdraw from the case as he did. (People v. Tucker, 61 Cal.2d 828, 831-832 [40 Cal.Rptr. 609, 395 P.2d 449] [noting that counsel for criminal defendants frequently withdraw from a case upon conviction and sentencing].) Our decisions recognize that an attorney may not, upon pronouncement of judgment against his client in a criminal case, withdraw in such a manner as to prejudice the client's ability to pursue his rights. (E.g., People v. Camarillo, 66 Cal.2d 455 [58 Cal.Rptr. 112, 426 P.2d 512]; People v. Diehl, 62 Cal.2d 114, 117-118 [41 Cal.Rptr. 281, 396 P.2d 397] [both holding that while a trial attorney need not represent a defendant on appeal, he must, where defendant indicates he wants to appeal, either file a notice of appeal, show defendant how to do it, or see that he gets another lawyer to do it].) However, it does not appear that Rosendale did so in the instant case, nor does petitioner so contend.
 This disposes of the basic issue presented by this petition--petitioner was adequately represented. But there is also involved the basic question of the innocence of petitioner. [8] A writ of habeas corpus may be granted on the basis of "new evidence that undermines the prosecution's entire case." (In re Imbler, 60 Cal.2d 554, 569 [35 Cal.Rptr. 293, 387 P.2d 6]; In re Lindley, 29 Cal.2d 709, 723-724 [177 P.2d 918].)
 Preliminarily, it should be noted that in this court's order to the referee to conduct a hearing in the instant matter we *214 did not instruct him to take evidence on the question whether petitioner is in fact innocent; rather, we instructed him only to take evidence regarding certain questions of fact bearing upon petitioner's claim of ineffective assistance of counsel. Thus, although the referee heard testimony by Boggess, much of it describing how he allegedly planted the knives in petitioner's cell, the referee's only comment in his report on Boggess' alleged guilt and petitioner's alleged innocence is "It is possible that Boggess may be telling the truth."
 However, the referee did make one finding which is relevant here. He found that "[p]rior to his conviction ... petitioner was informed that a fellow inmate would admit that he had placed the knives in the cell of the petitioner without the latter's knowledge." This finding is supported by petitioner's testimony. In In re Imbler, supra, 60 Cal.2d 554, 569, the court stated that evidence undermining the prosecution's case so as to warrant habeas corpus relief must be "new" evidence. However, it is so fundamentally unfair for an innocent person to be incarcerated that he should not be denied relief simply because of his failure at trial to present exculpatory evidence. Thus, the term "new evidence" as used in Imbler should be held to include any evidence not presented to the trial court and which is not merely cumulative in relation to evidence which was presented at trial. This does not mean that a defendant is entitled to a hearing on habeas corpus merely by producing some evidence tending to show his innocence not presented at his trial. Imbler and Lindley specify stringent standards regarding the character of new evidence which will warrant a hearing on habeas corpus.
 In In re Lindley, supra, 29 Cal.2d 709, 724, the court stated that evidence which "completely undermines the entire structure of the case presented by the prosecution at the [trial]" will support habeas corpus relief. It commented that certain evidence received at the hearing in that case "would have weakened the prosecution's case and presented a more difficult question for the trier of fact. But the testimony ... does not point unerringly to [petitioner's] innocence." (Id) Other evidence, the court stated, "presents only a conflict with the evidence which was before the jury." (Id) The opinion in In re Imbler, supra, 60 Cal.2d 554, 569- 570, dropped the word "completely" from the first passage quoted above but cited the subsequent language with approval. In both cases the evidence presented to establish petitioner's innocence was inconclusive. Neither case involved, as does the instant case, another person's confession to the crime *215 and the question of the confessor's credibility. Obviously a confession by another party exonerating the petitioner does point unerringly to petitioner's innocence and, if credited, undermines the entire case of the prosecution.
 As the evidence on the issue of petitioner's innocence now stands, we have on the one side Captain Rendleman's testimony at trial that petitioner confessed to him, attorney Rosendale's testimony that petitioner admitted his guilt to him and that he subsequently offered to obtain apparently perjured testimony (presumably of Boggess) to get himself off, and the fact that the knives were found in petitioner's cell. On the other hand we have petitioner's protestations of innocence during the trial and on this and prior petitions; affidavits of Boggess and one Garrity (like Boggess, a prisoner) stating that the former, with the latter's help, managed to enter petitioner's cell and conceal therein the knives belonging to Boggess; and the fact that the first of two inculpatory affidavits signed by Boggess (1) was dated within the period during which he could have been prosecuted for the offense he admitted, and (2) may, along with the other, have had an effect on his scheduled 1967 parole hearing in relation to the 5-years-to- life and 6-to-10 1/2-year sentences he began serving concurrently in 1960.
 [9] It is apparent that, considering the evidence at trial and the evidence at the referee's hearing, there is a sharp conflict as to the issue of petitioner's guilt. The mere existence of the conflict does not, without more, warrant the granting of relief. In every case where defendant has been convicted and seeks, in a subsequent habeas corpus proceeding, to establish innocence with new evidence, such a conflict will exist because of the evidence of guilt received at trial.
 At oral argument, however, counsel stipulated that he had produced all the evidence he then had available of the innocence of petitioner, and did not indicate that at present he had any additional evidence on the issue. The evidence produced at the hearing is not convincing. There is no need for a further hearing. We should find on the issue. Based on the record we find that petitioner has not demonstrated that he is innocent of the crime of which he was charged.
 [10] Petitioner raises for the first time in his traverse to respondent's objections and exceptions to referee's report the point that he is entitled to habeas corpus relief on the ground that he was not properly subject to prosecution under Penal Code, section 4502. Although this argument is timely raised, *216 since it relies primarily on a 1967 decision which is not applicable, People v. Romo, 256 Cal.App.2d 589 [64 Cal.Rptr. 151], it should be rejected.
 Penal Code, section 4502, as it read in 1961 (the year of petitioner's alleged offense and of his conviction), provided that "Every prisoner committed to a State prison who ... has under his custody or control ... any dirk or dagger or sharp instrument ... is guilty of a felony. ..." (Italics added.) It had been judicially declared in 1949 that section 4502 "covered prisoners in a state prison pursuant to a Youth Authority commitment. ..." (People v. Scherbing, 93 Cal.App.2d 736, 739 [209 P.2d 796]), and the 1963 amendment making the section apply to "Every person confined in a state prison. ..." (italics added) "was enacted to clarify the law and not to change it" (In re Smith, 64 Cal.2d 437, 440 [50 Cal.Rptr. 460, 412 P.2d 804]). Soledad, where petitioner was confined as a ward of the Youth Authority at the time he allegedly possessed knives, is a "State prison." (Pen. Code, 2045.)
 People v. Romo, supra, 256 Cal.App.2d 589 (hearing in Supreme Court denied January 24, 1968), is distinguishable. It holds that section 4502 does not apply to Youth Authority wards confined in the Deuel Vocational Institution on the ground that, at least as to persons placed there by the Youth Authority, Deuel is not a "state prison." (256 Cal.App.2d at pp. 594-595.) Deuel, unlike Soledad, is not classified as a "state prison" but simply as an "institution." (Pen. Code, 2035.) It should be noted that the court in Romo distinguished In re Smith, supra, 64 Cal.2d 437, a case involving companion section 4501, [fn. 9] on the ground that San Quentin, where the Youth Authority ward in Smith was confined, is [like Soledad] statutorily designated as a state prison while Deuel is designated only as an institution. (256 Cal.App.2d at pp. 594-595.) In Smith we rejected the petitioner's argument that his conviction pursuant to section 4501 was invalid.
 Penal Code, section 2045.1 provides that "the Director of Corrections may designate a portion or all of [the Soledad Correctional Training Facility] to serve the same purpose and to have the same security standards as [the Deuel Vocational *217 Institution]." [fn. 10] However, it cannot be argued on the basis of this statute that petitioner should be treated for purposes of section 4502 as if he were at Deuel.people v. Scherbing, supra, 93 Cal.App.2d 736, squarely held that section 4502 applies to "prisoners in a state prison pursuant to a Youth Authority commitment." (In re Smith, supra, 64 Cal.2d 437, 440.) The appellant in Scherbing was convicted for violating section 4502 "while an inmate of San Quentin under what purports to be a commitment from the Youth Authority, ..." (93 Cal.App.2d at p. 738.) The only difference between Scherbing and petitioner Branch in the instant case is that the latter was apparently committed to Soledad, a "State prison" (Pen. Code, 2045), at least in part under specific authorization of section 2045.1 while the former was committed to San Quentin, also a "State prison" (Pen. Code, 2020), solely under the more general authorization of sections 1753 and 1766 of the Welfare and Institutions Code [fn. 11] (People v. Scherbing, supra, 93 Cal.App.2d 736, 739-741; see also Welf. & Inst. Code, 1742, subd. (f), 1772).
 We conclude that petitioner was properly subject to prosecution under Penal Code, section 4502, and find that he was not denied effective assistance of counsel at his trial. We also find that the evidence now before us regarding petitioner's alleged innocence fails to undermine "the prosecution's entire case" so as to warrant relief under In re Imbler, supra, 60 Cal.2d 554, 569; for although Boggess' confession, if believed, " 'point[s] unerringly to [petitioner's] innocence' " (id at p. 570) there is a substantial question whether it should be believed.
 The petition for the writ is denied.
 Traynor, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Schauer, J., [fn. *] concurred.
 "The evidence shall be directed and responsive to the following questions which are hereby settled as the legal and proper issues:"
 "1. Prior to his conviction on November 29, 1961, for violation of section 4502 of the Penal Code, what information did petitioner have relative to"
 "(a) the involvement of inmates other than himself in the incident which was the subject of such conviction; and"
 "(b) The actual identity of the inmates so involved?"
 "2. In what manner did petitioner receive such information?"
 "3. What information relative to his own involvement in the incident or the involvement of others did petitioner communicate to his trial attorney, John C. Rosendale?"
 "4. What investigation, if any, was undertaken by petitioner's trial attorney ... upon the basis of such information?"
 "5. What defensive matter, if any, was presented at trial upon the basis of such information?"
 "6. Are there any grounds for holding that petitioner's failure to seek relief earlier should not bar him from seeking relief at the present time?"
NOTES
[fn. 1] 1. A referee's findings of fact are, of course, not binding on this court, and we may reach a different conclusion on an independent examination of the evidence produced at the hearing he conducts even where the evidence is conflicting. (In re Atchley, 48 Cal.2d 408, 411 [310 P.2d 15].) However, where the findings are supported by "ample, credible evidence" (In re Gonsalves, 48 Cal.2d 638, 642 [311 P.2d 483]) or "substantial evidence" (In re Riddle, 57 Cal.2d 848, 853 [22 Cal.Rptr. 472, 372 P.2d 304]) they are entitled to great weight (In re Riddle, supra, at p. 853; In re Del Campo, 55 Cal.2d 816 [13 Cal.Rptr. 192, 361 P.2d 912]) because of the referee's "opportunity to observe the demeanor of the witnesses and weigh their statements in connection with their manner on the stand ...." (In re Atchley, supra, at p. 411).
[fn. 2] 2. Branch's subsequent statements suggest that the claimed lack of opportunity was due to his difficulty in contacting or securing the witnesses rather than to any disagreement with his attorney as he later claimed. When the prosecutor said "Well, you have the opportunity. ... You're in court, prove it." Branch stated "You lock me up all day. I can prove it."
[fn. 3] 3. In our order instructing the referee to hold a hearing relative to the instant petition we stated:
[fn. 4] 4. In a signed but undated statement under oath amplifying an affidavit dated November 29, 1963, Boggess stated that on August 28, 1961, the day after he had been involved in the fight referred to earlier in the text, he heard he was going to be shaken down; therefore, he and a fellow inmate devised a means of hiding two knives owned by Boggess in Branch's cell which they were sure would not be shaken down, apparently because Branch was a Youth Authority inmate. They hid them there while Branch was in a workshop.
[fn. 5] 5. Boggess testified at the hearing that he did not go from Soledad to San Quentin until "[a] year or more" after petitioner had gone to trial for possession of the knives.petitioner's preliminary examination was on October 9, 1961, and his trial was on November 29, 1961. He was sentenced on January 5, 1962.
[fn. 6] 6. Rosendale testified that although Branch's defense at trial was that he did not know the knives were in his cell, he (Rosendale) did not recall Branch ever indicating to him, prior to or during the trial, that he did not know the knives were in the cell.
[fn. 7] 7. However, Rosendale did state that his notes dated mid-November 1961 contained information obtained from his first meeting with Branch as well as information added later from time to time.
[fn. 8] 8. This evidence consists of petitioner's testimony at trial concerning "people" he could "bring down here" to contradict the testimony of prison officials and the evidence showing that, as the referee found, "[p]rior to his conviction ... petitioner was informed that a fellow inmate would admit that he had placed the knives in [petitioner's] cell ...." It should be noted that this finding is supported only by the testimony of Branch and the Soledad trustee, Wilburn Matthews, the testimony and November 29, 1963, affidavit of Boggess, and the affidavit of another inmate. It is contradicted by the May 15, 1964, affidavit of Boggess. Thus, to the extent that this finding is inconsistent with the finding as to when Branch informed Rosendale that he could get some inmates to take the blame, it should be viewed with suspicion.
[fn. 9] 9. Section 4501 provides, in relevant part, that "Every person confined in a state prison of this state ... who commits an assault upon the person of another with a deadly weapon or instrument ... shall be guilty of a felony ...."
[fn. 10] 10. Soledad is a "medium security type institution" (Pen. Code, 2045.1) while Deuel is an "intermediate security type institution" (Pen. Code, 2036).
[fn. 11] 11. Section 1753 of the Welfare and Institutions Code provides that the Youth Authority is "authorized to make use of law enforcement, detention, probation, parole, medical, educational, correctional, segregative and other facilities, institutions and agencies, whether public or private, within the State." Section 1766 gives the Authority power to confine all offenders committed to its charge "under such conditions as it believes best designed for the protection of the public." Sections 1742, subdivision (f) and 1772 specifically refer to offenders under the control of the authority who have been placed in state prisons.
[fn. *] *. Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.