[No. B047395. Second Dist., Div. Seven. May 5, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
DWAYNE FOSTER, Defendant and Appellant.

[No. B059273. Second Dist., Div. Seven. May 5, 1992.]

In re DWAYNE FOSTER on Habeas Corpus.

COUNSEL

Mark Randall Ellis, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Keith H. Borjon and Leslie P. McElroy, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

WOODS (Fred), J.—A jury convicted appellant of cocaine possession (Health & Saf. Code, § 11350, subd. (a)); the trial court found true[1] two alleged state prison felony priors (Pen. Code, § 667.5, subd. (b)), and sentenced appellant to a five-year state prison term.

Except for a claimed sentencing error, the sole issue on appeal and on habeas corpus petition is ineffective assistance of trial counsel. The proceedings have been consolidated for decision. We deny the petition and affirm the judgment.

INTRODUCTION

When there is no claim of insufficiency of evidence we typically synopsize the trial testimony with a perspective favoring the judgment (*People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304 [228 Cal.Rptr. 228, 721 P.2d 110]) and largely ignore appellant's version of events because the finder of fact rejected it. In this case we depart from our usual practice.

Only by considering appellant's version of events in detail can we assess the effect of claimed trial counsel incompetence: failure to offer a co-arrestee's extrajudicial confession.

FACTUAL AND PROCEDURAL BACKGROUND

On September 27, 1989, about 9:25 p.m., Los Angeles Police Officers Caballero and Katz were on uniform patrol in an unmarked police vehicle

---

[1]Appellant's bifurcation motion was granted, and he waived jury regarding the alleged priors. Following the jury's guilty verdict the prosecution presented documentary proof of the prior felony allegations.

when they saw appellant standing alone on the sidewalk in front of a residence at 1164 East 23d Street in Los Angeles. Officer Caballero, who was driving, illuminated his high beams and shone a spotlight on appellant. The officers were about 15-20 feet from appellant when they saw him make a tossing motion with his right hand, dropping several off-white rock-like objects. They simultaneously said "Did you see that?" and Officer Caballero stopped the car. Both officers got out and Officer Caballero recovered three rocks of cocaine about twelve inches from appellant's right foot.

Another man, Frank Morgan, was leaning against a fence about 15-20 feet from appellant. The officers determined there was an outstanding parole violation arrest warrant for him. Both appellant and Morgan were arrested, placed in the police vehicle, and driven the three-quarters of a mile to the Newton Station where they were routinely booked.

About two weeks later, on October 13, 1989, appellant was held to answer for possession of cocaine.

An information was filed October 20, 1989, and amended December 12, 1989. On December 14, 1989, while the case was trailing for trial before Superior Court Judge Paul Flynn, appellant's attorney, a deputy public defender, informed the court that he was engaged in trial and would be unavailable to try appellant's case for at least a week. Present in the courtroom was Frank Morgan, still in custody, a prospective defense witness.

Since defense counsel was unavailable to try the case and appellant would not waive time, Judge Flynn decided to transfer the case to the master calendar court, Department 100. Before he did so the following colloquy occurred.

"The Court: I will send it to 100 for tomorrow morning at 8:30. It will be 56 of 60. [¶] Now, in regard to Mr. Morgan. He is in custody. I would like him ordered to 100 for tomorrow morning. Mr. Morgan apparently has filled out a statement in which he assumes culpability for this offense. [¶] Is that true, Mr. Morgan?

"Witness Frank Morgan: Yes it is.

"[Deputy Public Defender]: This statement is signed by you and you wrote it yourself.

"Witness Frank Morgan: Yes.

"[Deputy Public Defender]: Your honor, I will read the statement into the record.

" 'I, Frank Morgan, was arrested on September 27, 1989 with Dwayne Foster when he saw the police pick a piece of cocaine off the ground and tell Mr. Foster, "This is yours because I saw you throw it." ' "

" 'He was lying, because I dropped it. I was nervous because I was on parole. They charged Mr. Foster with possession of a controlled substance, charged me, Frank Morgan, with a probation violation.' "

Five days later, on December 19, 1989, the public defender was relieved and private counsel, David R. Reed, was appointed to represent appellant.

Before trial, Mr. Reed informed the court he intended to call Frank Morgan as a defense witness and that Mr. Morgan would testify "the cocaine was his and it was not the defendant's."

During trial, out of the presence of the jury, the court inquired of Mr. Morgan whether or not he was going to testify. After conferring with the attorney the court had appointed to represent him, Mr. Morgan, citing his privilege against self-incrimination, declined to testify.

The prosecution rested and the defense called their sole witness, appellant. This was his testimony.

*Appellant's testimony*

On September 27, 1989, appellant and his friend Frank Morgan were at the Twenty Second Street Recreation Center in South Central Los Angeles. They left the center about 7:30 p.m. and just as they began walking the three blocks to where they lived they saw Chauncey, someone they knew, driving their way. They flagged him down and he told them to hurry into his car, a 1968 to 1970 Chevrolet Nova, because it was overheating. Chauncey drove to Central Avenue, stopped for a light, turned left, then right and then pulled into a residential driveway (1164 East 23d Street) where he knew he could get water real fast.

As Chauncey entered the uphill driveway "the car conked out." The radiator was "steaming" and "the lights in the dash was [*sic*] red."

Chauncey got the water hose but it wouldn't reach the radiator so appellant and Frank Morgan pushed the car "all the way up to the gate." They opened the hood, removed the radiator cap, and "when [appellant] put the water hose in the car [it] went dead." They let the car "sit" and then Chauncey started it.

With the hood still up and the motor running, appellant continued putting water in the radiator. Frank Morgan was standing to his right, "like, against the fence."

In appellant's words, this is what happened next:

"As I am letting the water hose roll, I mean run, two cars approaching. This is just getting dark, just getting dark, between 7:30. Two cars approaching from Griffith Avenue at of [sic] a high like speed. High beam lights was on, okay?

"Both above [of?] them was near each other. So I look up in the hood, I am looking through the hood because the the hood up and I am in it, right, trying to see if there is some reckless driver or somebody because the back end of the car is sticking in the street. I don't want him to hit the car when I am trying to put water in it.

"So when the car drive up, stop real fast, I don't recall if they said the word 'Freeze, hold it.' I can't recall which word they said. Then—it could have been 'Hold it,' okay. Okay.

"So I come off my little hood and, 'Put your hands up.' I put my hands and he come out to where I am. So I walk out there. Chauncey was right there because he was starting the car [and] he's got one foot on the gas of [sic] one foot outside the car. And he has had to come out that car to walk in the streets past me. They have to be watching this man standing against the gate facing the street, okay."

Then, appellant testified, an officer removed the contents of his and Chauncey's pockets "and laid it on the ground." On command, he and Chauncey "[g]ot down on our knees into the oil like deposits." Officers stood on the back of appellant's legs and Officer Caballero continuously struck appellant's right shoulder with his flashlight. "And then while I was laying like this on the ground with my back toward the sidewalk from the streets, they all behind us, it was like, man, about seven or eight units, about twenty officers, because they started coming from the back of the house and all over. A lot of cars out there. Wasn't nobody in the cars. All of them was empty, it empty."

During this time Morgan was by the fence, leaning against it, facing the street. Officer Katz—"[l]ittle chubby Mexican officer, okay? Little chubby guy"—"walk[ed] over to . . . Morgan [and] . . . by his left [] foot he picks up a brown piece of paper . . . like from a grocery bag . . . And he goes in

the paper, okay. Whatever he took out [*sic*] the paper, I never was able to see it because his hand was over it, okay."

Officer Katz returned to where appellant and Chauncey were and asked " 'Whose car is this?' " Chauncey said " 'My friend's car.' "

Just then "the guy who loaned Chauncey the car was coming up the street . . . ." The officers searched the car, "back seat, front seat, open[ed] the trunk."

During the car search, senior police officers, sergeants with stripes, arrived.

The car owner told Officer Caballero, " 'This is my car' " and Officer Caballero asked him if he had let Chauncey use it, and he said "yes." Then Officer Caballero "told Chauncey, 'Okay, you pick your money up, you pick up your stuff, and you go.' "

Chauncey picked up his stuff and walked away. The car owner, who was "kind of . . . mad because [Chauncey] had his car too long, . . . came and got his car."

Officer Katz asked Morgan his name, and told him " 'You just tell me your name and I will let you go.' " But Morgan "was . . . stuttering because he was high from . . . cocaine . . . [h]e was nervous, paranoid."

Morgan gave a different name and Officer Katz said " 'Okay, just put him in the car.' "

But before Officer Katz said that, and while "he had all three[2] of us on the ground," he said " 'You know what, I got enough to give you all some.' "

Appellant and Morgan were put in the rear of Officer Caballero's vehicle while the police "all stood around the area" talking. "They just out talking and talking, right."

No one—during the whole process—asked appellant his name, "just Chauncey's name and Morgan's name. He don't care about my name."

---

[2]The only reference, not explained, to Frank Morgan lying on the ground.

Officers Caballero and Katz returned to their vehicle and, with a third officer[3] sitting in the rear with appellant and Morgan, instead of driving to the Newton Station "cop[ped] a U-turn." They drove to Main and 36th Street and stopped. "All the other cars come. They meet over there. So we the second car from the back and was more cars up in front. All plain cars." It took "about eight minutes to get there."

All the police got out of their different colored cars and met in front of the lead car. They talked for about 25 minutes.

Then all the officers returned to their cars and left. We "cop[ped] a U-turn again, and go back that way where they brought us from." Officer Caballero drove to Adams and Maple and "we [sat] in the car facing, like Downtown L.A. And the other cars they just passed in the middle of the street."

Then Officers Caballero and Katz got on walkie-talkies and as appellant described it: " 'Tack one,' I guess tack two got ready. He said 'We are ready.' And whatever 'Tack three' or whatever, they was ready. They say 'Tack one go.' And they pull off and we turned that corner right there. First one is Compton. They turn right. They turn right. They were running red lights, coming this way, like this. And so they—errrrrrrrrr—stop. They jump out. It was chicanos sitting on the sidewalk. I guess they was drinking beer. Seemed to me like about nine or ten of them."

Officers Caballero and Katz "jump[ed] out of the car. Run over there and they go. 'Hold it, hold it.' One of them [the chicanos] tried to walk away. And the lady approached him. She started looking around to a parked car where he was at and she goes into the bushes and come out with a plastic bag. I wouldn't lie you to, okay. Plastic bag."

"I could see it in the light because all the lights all on the cars. And the plastic bag had a yellow object. I can't tell you if it was cocaine or marijuana. I can't say [b]ecause I would have to be truthful. He had an object in it, pretty large object. And the lady was showing it to them, showing it to my officers and more officers. So they played with it for awhile."

Two "chicanos" were arrested and put in another police car. We had been at that location about 15 minutes when "[t]hey got a call. This is another call. . . . We started speeding real fast." "It was sixty and over."

"So it's nighttime. And so they was speeding hitting corners and running red lights, mashing on the brakes real hard getting off the brakes fast and—"

---

[3]Later, without explanation, appellant testified that only Officers Caballero and Katz were in the car with him and Morgan.

When they got to Ascot and 56th Street "[t]hey pull[ed] up and they pull[ed] past—one car was crashed up on the sidewalk. . . . And they say, 'Well, that's a four-tre car.'" One of the officers recognized the car as belonging to a "Four-Tre" gang member.

"And so they—whatever they had on the dispatch, they knew what they was looking [for]. . . . They was looking for a suspect in black pants, white T-shirt. I can't remember what kind of tennis shoes."

"So they looking, I'm looking, on the streets. I am ain't jiving. They looking for the suspect and I am looking too, because I am in the back seat. They go around the corner and some teenagers standing there and some girls and some guys, and some one suspect was wounded, okay? And they call for a paramedics to come to see about them."

The paramedics arrived and attended to the suspect's wound. Then Officers Caballero and Katz got back in our car and we again started searching for the other suspects, "going up the alleys, and they do the flashlight like this and over my head."

Appellant explained the incident: "I will tell you what it was, it was a gang related shoot-out; okay? And they were looking for the gang members, okay, going through dark alleys, a lot of trash, bottles, and running over stuff. . . . We end up on Hooper. . . . Then we come back to the scene, stop, cut the motors off, and they act like they was making the report. . . . We stayed out there so long with them."

Officers Caballero and Katz then received and responded to *another* call, appellant didn't know what kind. But they drove to a Shell station on Vernon and it only took about two minutes to get there because the officers were "still hot from chasing . . . enemies," so they "speeded over there." The officers left the vehicle and talked to a senior Black officer who had two suspects in the back seat of a gray car parked against a wall. They talked about four-five minutes.

Then Officers Caballero and Katz drove appellant and Morgan to the Newton Station, brought them inside, and "handcuffed [them] on the bench." Appellant's handcuffs were so tight he almost cried and he asked that they be loosened but Officer Katz said "'if you [B]lack, you ain't got nothing coming.'"[4]

Appellant continued: "So I sit there, me and Frank Morgan, a lot of more guys lined up on the bench they had arrested that night. So we sit on the

---

[4]On rebuttal, Officer Katz testified he is Black.

bench handcuffed. Three minutes, two minutes and 70 something seconds later they came running, same officer, run out that police station real fast. A lot of more police run out. So they leave. So we still handcuffed on the bench."

By this time about two hours had passed since the arrest of appellant and Frank Morgan.

It was another hour and 20 minutes to an hour and a half before the officers who had run out of the station returned. But when they did return they had a "uzi machine gun with air holes on the side and they have some gang members."

On cross-examination appellant testified that "Chauncey" was just a nickname and although he didn't know his real name he did know that Chauncey "lives right now" on Adams and Griffith. When asked about who said "If you [B]lack, you ain't got nothing coming" and where it was said, appellant now testified it was Officer Caballero who made the statement and it occurred at the arrest scene. The prosecutor's follow-up question produced this colloquy:

"Q. Did you believe that to be a racial comment on the part of Officer Caballero?

"A. Well, Miss, that night, okay, I have to answer this. Can I use that bandanna?

"Q. Pardon me?

"A. A bandanna?"

*Prosecution rebuttal*

Officer Katz testified he no longer works with Officer Caballero and had not discussed the case with him. Like Officer Caballero, he testified that appellant dropped some rock cocaine, was arrested, directly taken to the Newton Station, and routinely booked. None of the other events appellant had described ever occurred and there was no "Chauncey" nor any other person who walked up and claimed an overheated car as his.

DISCUSSION

1. *Incompetence of counsel*

Appellant contends his trial counsel was guilty of incompetence by not offering into evidence Frank Morgan's extrajudicial confession. He

argues that because the confession had been "read into the record in open court at an earlier hearing" it was incompetent of counsel not to have learned of it[5] and to have had it admitted into evidence.

Respondent disagrees, asserting: (1) the record fails to show counsel was incompetent for not discovering the statement (2) the statement, even if it had been discovered, was not admissible as a statement against penal interest (Evid. Code, § 1230) and (3) even if admissible, there was no prejudice because the evidence was "overwhelming" ("Both police officers testified that appellant, *not* Frank Morgan, possessed the rock cocaine") and "[g]iven the verdict, it is clear the jury did not believe appellant."

■ The standard of review applicable to a claim of ineffective assistance of counsel is settled. It "has two components. 'First, [appellant] must show that counsel's performance was deficient; specifically, he must establish that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Second, he must establish prejudice. He must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome [citations]. Defendant has the burden of proving an ineffective assistance claim by a preponderance of the evidence [citation].'

■ "Counsel, to be effective, must investigate all factual and legal defenses. If counsel's failure to do so causes the withdrawal of a potentially meritorious defense, a defendant has been denied effective assistance of counsel." (*People* v. *Sanders* (1990) 221 Cal.App.3d 350, 366-367 [271 Cal.Rptr. 534].)

We assume, without deciding, that (1) competent counsel would have discovered Frank Morgan's statement (or its equivalent), (2) the statement would have qualified as an Evidence Code section 1230[6] declaration against

---

[5]The declarations appended to the habeas corpus petition conflict regarding trial counsel's knowledge. Appellant declared that, before trial, he twice told his counsel about the statement. The deputy public defender who initially represented appellant and who obtained the Morgan statement, declared that the statement was no longer in the public defender case file and "[a]s a course of business, it would have been turned over to" appellant's new attorney. Trial counsel's declaration states that he was not aware of the statement during trial, did not and does not have possession of the written statement.

[6]The section provides in pertinent part: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

penal interest[7], (3) competent counsel would have offered the statement into evidence, and (4) the trial court would have admitted it.

 Therefore the sole question to be decided is prejudice. That is, if the Morgan statement had been admitted into evidence is it reasonably probable the jury would *not* have convicted appellant?

Our answer, although based upon reasoning different from respondent's, is no.

Respondent begs the question by arguing there was no prejudice because the jury did not believe appellant. The essence of *appellant*'s contention is the jury *would have* believed him if only they had known of Morgan's corroborating statement. By respondent's reasoning the only *valid* such claims are those which are not reviewable because the jury having believed the defendant, acquitted him.

We further disagree with respondent that appellant's claim may be rejected simply because two police officers testified they saw him and not Frank Morgan drop the rock cocaine. Such testimony—certainly persuasive, sufficient for conviction, and usually resulting in a conviction—is not *inherently* "overwhelming."

Rather, we agree with appellant that an appropriate prejudice analysis turns on the effect the Morgan statement would have had on appellant's credibility. *If* its receipt might likely have caused the jury to believe appellant, then its omission was prejudicial. Otherwise, it was not.

If this case involved a single, crucial credibility conflict we would be inclined to find prejudice. Thus, for example, had appellant testified that at 9:25 p.m. he was standing on the sidewalk when a police car drove up, two officers got out, one retrieved some rock cocaine near Frank Morgan's foot but he, appellant, was wrongly arrested for its possession and taken to Newton Station and booked—a single, crucial conflict would have been presented.

The opposite occurred. With each ever-more-complicated and farfetched episode appellant described, the credibility significance of "who dropped the cocaine" shrank. When appellant finally ended his escalating high adventure scenario, he had created not a "thousand points of light" but a thousand

---

[7]But see *People* v. *Chapman* (1975) 50 Cal.App.3d 872, 878-880 [123 Cal.Rptr. 862]; *People* v. *Blankenship* (1985) 167 Cal.App.3d 840, 847-849 [213 Cal.Rptr. 666]; *People* v. *Sanders*, *supra*, 221 Cal.App.3d 350, 379.

points of *sight*. Unless he corroborated *some* of these sights—the existence of Chauncey; the presence of the Chevrolet Nova owner at the arrest scene; 9-10 unmarked police cars with about 20 officers, including senior officers, at the arrest scene; the 25-minute mass police meeting at 36th Street and Main; the walkie-talkie "tack one" episode culminating in a 15-minute investigation of 10 beer-drinking Chicanos; a crashed car at 56th Street and Ascot; a gang related shooting with an injured victim treated by a paramedic team followed by a protracted search for the gang perpetrators; the Vernon Street Shell station meeting with the senior Black officer; the one and one-half hour Newton Station emergency leaving all the bench arrestees unattended; the seizure of a distinctive Uzi machine gun—he invited the jury to reject his testimony as unbelievable.

Appellant corroborated *none* of these sights. Nor is there any claim his trial counsel could or should have done so.

Attempting to cope with appellant's testimony, his trial counsel argued to the jury that it was such a "cockamamie story" it had to be true. The trial court agreed with the "cockamamie" part. At the sentencing hearing he told appellant: "You could have had twelve of your cell mates in the jury box and they would have convicted you. . . . Nobody is going to believe that cockamamie story. . . . Some people believe there was a Santa Claus, but no one would believe your story." Certainly the jury didn't. After deliberating less than an hour, the jury returned from their Santa Claus-Christmas experiences to promptly convict appellant at 9:15 a.m. on December *26th*.

We are satisfied omission of the Morgan statement caused no prejudice.

2. *Sentencing error*

▮ Appellant contends the trial court erred in imposing the upper three-year term in violation of Penal Code section 1170, subdivision (b)'s proscription: "The court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under Section 667.5 . . . ."

Although the trial court did recite appellant's state prison prior convictions as a reason for imposing the upper term, the error was harmless.

The trial court stated he had read and considered the probation report and agreed there were only factors in aggravation and none in mitigation. Apart from the impermissible "the defendant has served a prior prison term" factor (Cal. Rules of Court, rule 421(b)(3)), any one of three other aggravating factors justified the trial court's sentence choice: appellant's convictions

were numerous and of increasing seriousness (*id.*, rule 421(b)(2)); appellant was on parole when he committed the offense (*id.*, rule 421(b)(4)); appellant's prior performance on parole was unsatisfactory (*id.*, rule 421(b)(5)).

Given this record, appellant's 12 convictions *other than* the 2 state prison priors, and the views clearly expressed by the trial court, we are satisfied it would be an "idle gesture[ ]" (*People v. Blessing* (1979) 94 Cal.App.3d 835, 839 [155 Cal.Rptr. 780]) to remand the matter for resentencing. (See also *People v. Green* (1988) 200 Cal.App.3d 538, 543 [246 Cal.Rptr. 164]; *People v. Preyer* (1985) 164 Cal.App.3d 568, 577 [210 Cal.Rptr. 807]; *People v. Hartsfield* (1981) 117 Cal.App.3d 504, 509-510 [172 Cal.Rptr. 794].)

DISPOSITION

The judgment is affirmed. The petition is denied.

Lillie, P. J., concurred.

**JOHNSON, J.**—I respectfully dissent.

I have serious problems with the majority's finding that no prejudice resulted from counsel's failure to introduce a third person's admission of guilt as exculpatory evidence. It is difficult to argue a statement from a third party which completely exculpates defendant could not create a reasonable doubt as to defendant's guilt. Thus, I am led to the inevitable conclusion this defendant was prejudiced by his counsel's incompetent investigation and failure to introduce this exculpatory evidence.

The exculpatory evidence which was not introduced at defendant's trial constitutes a "crucial" defense, as required by *In re Saunders* (1970) 2 Cal.3d 1033, 1049 [88 Cal.Rptr. 633, 472 P.2d 921]), "the possible defense so withheld must be termed a 'crucial' one." A defendant is denied the effective assistance of counsel if, " 'by reason of counsel's failure to perform the obligations imposed upon him, defendant is deprived of an *adjudication* of a crucial or potentially meritorious defense.' " (*People v. Shaw* (1984) 35 Cal.3d 535, 541 [198 Cal.Rptr. 788, 674 P.2d 759], italics in original.)

As held in *People v. Mitchell* (1893) 100 Cal. 328, 333, it is always proper to introduce evidence suggesting some other person and not the defendant committed the crime with which he is charged. (See also *United States v. Robinson* (2d Cir. 1976) 544 F.2d 110, 112). In order for evidence of third party culpability to be admissible as *new* evidence, "there must be direct or circumstantial evidence linking the third person to the actual perpetration of

the crime." (*People* v. *Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99].) "Obviously a confession by another party exonerating the petitioner does point unerringly to petitioner's innocence and, if credited, undermines the entire case of the prosecution." (*In re Branch* (1969) 70 Cal.2d 200, 215 [74 Cal.Rptr. 238, 449 P.2d 174].)

The exculpatory evidence in question is a competent and reliable admission of a third party that he committed the offense for which defendant had been charged. The majority does not question the competence or reliability of this evidence. Nor could they. Morgan's admission of guilt was made in open court, was definitely against his penal interest at the time it was made,[1] and no evidence suggests the statement was untrustworthy. Thus, this exculpatory evidence is very probative and only because of ineffective assistance of counsel was not discovered and introduced at trial.

In *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297, 312-313, 93 S.Ct. 1038]) the United States Supreme Court reversed Chambers's conviction, finding that exclusion of critical exculpatory evidence was a denial of the right to a fair trial. In *In re Hall* (1981) 30 Cal.3d 408, 427-429 [179 Cal.Rptr. 223, 637 P.2d 690], the court held a defendant was denied effective assistance of counsel due to the attorney's failure to investigate information which indicated another person was guilty of the offense. In *United States* v. *Robinson, supra,* at pages 112-113 the court reversed Robinson's conviction, holding the exclusion of exculpatory evidence severely prejudiced Robinson's defense. The exculpatory evidence would have been sufficient to create a reasonable doubt as to defendant's guilt. (See also *United States* v. *Armstrong* (9th Cir. 1980) 621 F.2d 951, 953.) As these cases indicate, exculpatory evidence which is excluded from trial affects a defendant's substantive rights. The case at bar is no different. Defendant was

---

[1] At oral argument, the Attorney General argued the statement was not against Morgan's penal interest because two eyewitnesses later testified they had seen the defendant rather than Morgan commit the crime. Since Morgan supposedly knew these witnesses would pin the blame on appellant he could confess his guilt without worrying he actually would suffer any penal consequences from making that statement.

This argument is built on a fallacy—treating *evidence* suggesting guilt as *absolute proof* of guilt. Eyewitness testimony, in particular, is of dubious reliability. (See *People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011] [permitting expert testimony about the unreliability of eyewitness testimony based on scientific studies establishing that unreliability].) The eyewitness testimony purportedly identifying appellant rather than Morgan as the guilty party fell far short of the sort of absolute proof Morgan could have relied on to exonerate him should he give a false confession of guilt. Perhaps it would be a different issue were there to have been a clear, accurate videotape showing Morgan was innocent. But one or two eyewitnesses do not make an ironclad case. Only a fool would confess to a crime he did not commit in the hope the jury would believe others testifying to his innocence in preference to his own admission of guilt. Accordingly, there is no reason to believe Morgan felt he was immune from penal consequences when he admitted guilt and exonerated appellant.

deprived of valuable exculpatory evidence, and thus his defense was prejudiced due to ineffective assistance of counsel.

In assessing the prejudice from counsel's error, the question is whether there is a reasonable probability that, absent the errors, a reasonable jury could have entertained a reasonable doubt respecting appellant's guilt. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688, 694 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052].) In making this determination, a court must consider the totality of the evidence before the jury. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court must ask if the defendant has met the burden of showing it is reasonably likely the decision would have been different absent those errors. (*Id.* at p. 695 [80 L.Ed.2d at p. 698].)

The majority does not consider the totality of the evidence, but places inordinate weight on the credibility of the defendant's own testimony as a determinative factor. The majority incorrectly assumes that because the jury quite probably found defendant's own story unreliable, it would have convicted him regardless of powerful, probative evidence of his innocence of the crime charged. The majority is misled by this reasoning to conclude the jury could not have entertained a reasonable doubt of appellant's guilt even if the exculpatory evidence had been introduced.

The majority's position neglects the entirely reasonable possibility a jury could find portions of a defendant's testimony unreliable or unbelievable and still find him innocent of the charged offense. The fact a defendant may seem unbelievable as a witness is not conclusive as to his guilt of the crime itself. As it turns out the substance of defendant's testimony, which the majority calls a "cockamamie" story, was not directed toward the issue of his guilt or innocence. Rather it was an account of the events after his arrest. I disagree with the majority's conclusion that no evidence—even something as dramatic and conclusive as a third person's confession exonerating the defendant—could influence the jury's decision on the issue of guilt or innocence just because it is reasonable to find the jurors would disbelieve the so-called "cockamamie story."[2]

It is true jurors are allowed to infer witnesses are lying in one part of their testimony because they are shown to have lied in another part of that

---

[2]The so-called "cockamamie story" probably would not have been told had appellant's counsel discovered and introduced Morgan's statement exonerating appellant at the trial. With that evidence in the record, it would have been unnecessary for appellant to even testify at the trial. So it is a bit disingenuous to argue the jurors would not have believed Morgan's exculpatory evidence because of the unbelievability of other testimony they would not have heard at this trial except for defense counsel's failure to find and present the stronger evidence.

testimony. But jurors are not required to do so. Indeed jurors are free to disbelieve a part of a witness's testimony and believe other portions of that same witness's testimony. For the same reason, jurors are free to disbelieve a defendant's entire *testimony* yet believe his denial of guilt of the overall charge and likewise to believe the testimony of other witnesses exonerating him of that charge.

Jurors are fully capable of making discriminating judgments. They know even innocent people sometimes tell lies out of desperation and fear of unjust conviction. Reasonable jurors could have reasoned just that way in the instant case if they had been presented with Morgan's confession along with appellant's so-called "cockamamie story." They could have rejected appellant's own testimony as unbelievable yet accepted as truthful Morgan's statement admitting his own guilt and exonerating appellant. After all, the jury was not being asked to decide whether appellant was guilty of perjury. They were there to decide if he was guilty of the offense charged in the information before them. (In actuality, of course, had appellant's lawyer rendered effective assistance the jury would not have had to weigh Morgan's exonerating statement against appellant's "cockamamie story" because appellant would not have had to testify at this trial. See footnote 2, *ante*, at page 16. Consequently, only the exonerating evidence would have been before the jurors and they would not have had to discriminate between appellant's credibility as a witness and his guilt of the charged offense.)

Since reasonable jurors could have entertained a reasonable doubt about appellant's guilt had they heard Morgan's admission of guilt exonerating appellant, counsel's failure to discover and introduce that statement was prejudicial to his client. Consequently, I would have reversed the conviction for a new trial where the exculpatory evidence was produced.

Appellant's petition for review by the Supreme Court was denied July 29, 1992. Mosk, J., was of the opinion that the petition should be granted.