Filed 6/29/16  P. v. Tran CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VICTOR MINH TRAN,<br><br>    Defendant and Appellant. | D067800<br><br><br><br>(Super. Ct. No. SCD249683) |

APPEAL from a judgment of the Superior Court of San Diego County, Melinda J. Lasater, Judge.  Affirmed.

Lizabeth Weis, under appointment by the Court of Appeal

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Victor Minh Tran of seven charges arising from events that occurred on three separate dates:  (1) one robbery and one assault with a deadly weapon on April 9, 2013; (2) two attempted murders and two assaults with a firearm on

May 28, 2013; and (3) possession of a firearm by a felon on July 23, 2013. Defendant moved for a new trial on the basis his counsel performed ineffectively by failing to adequately investigate potential alibi witnesses for the May 28 offenses. The court held an evidentiary hearing, during which defendant's trial counsel, investigator, and potential alibi witnesses (among others) testified. Based on "the totality of the circumstances"—including counsel's and the investigator's testimony that defendant initially told them that his alibi witnesses will " 'say whatever I want them to say' "—the trial court made a "credibility call" and determined counsel "was within the range of reasonable competence" in not pursuing the alibi defense. The court also found defendant failed to show any prejudice. We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### I. *Prosecution Case*

#### A. *Gang Evidence*

The People's first trial witness was Chris Tews, a San Diego Police Department detective who focuses on Asian gangs. Tews testified about the Asian Crip criminal street gang that operates in the San Diego community of Mira Mesa. He described the gang's history, structure, and culture (e.g., signs, symbols, attire, and terminology). He explained Asian Crip gang members go "patrolling" in their "turf" to "put in work, meaning they're going to go commit crimes to benefit their gang." They generally target rival gang members or targets of opportunity.

---

[1] Although defendant's appeal relates only to the May 28, 2013 offenses, we also discuss the April 9 and July 23 crimes to the extent they relate to the May 28 offenses.

2

Tews also discussed a subset of the Asian Crip gang known as "LOY" or "Locced Out Youngsters." He described LOY as the newest "generation" of Asian Crips.

Tews opined defendant is a member of the Asian Crips.

### B. *April 9, 2013*

On April 9, 2013, Jorge Medina[2] and a neighbor walked to a convenience store near their homes in Mira Mesa. They were approached by a vehicle occupied by two Asian males: a driver in his mid-30's (later identified as Xai Lor, a documented member of the Oriental Boy Soldier gang) and a front-seat passenger in his teens (later identified as Vincent Tran, a documented LOY member).[3] Vincent asked Jorge if he was in a gang. When Jorge said he was not, Vincent said "LOY" and "Fuck Mexicans." Jorge continued walking to the convenience store.

Vincent believed Jorge was a member of a rival Mexican gang. He and Lor went to pick up nearby LOY members and told them they "got an enemy." Defendant and Chris Amanance,[4] a documented LOY member, were among those who joined Lor and Vincent. The group returned to the convenience store and encountered Jorge in the parking lot.

---

[2]   We will refer to Jorge Medina by his first name because one of the alibi witnesses discussed below, Rita Medina, has the same last name. We will also refer to Rita Medina by her first name. There is no indication in the record that Jorge and Rita are related.

[3]   Vincent Tran is not related to defendant Victor Tran. To avoid confusion, we will refer to Vincent Tran by his first name.

[4]   Amanance's name is spelled differently throughout the reporter's transcript and the parties' briefing. We will use this spelling for uniformity.

Defendant and Jorge began fighting, then the rest of the group joined in.  Someone in defendant's group took Jorge's hat and necklace, then stabbed him.  Defendant's group fled.  Jorge was hospitalized for about two months with a punctured lung.

C.  *May 28, 2013*

On May 28, 2013, Dana Guzman and Steven Rivas were riding their bicycles home from a grocery store in Mira Mesa when they spotted two white cars parked on the street in front of a house on Parkdale Avenue.[5]  Guzman later identified defendant as the driver of one of the cars, a mid-1990's two-door Honda.[6]  Guzman described defendant's hair as being shaved short on the sides and back, with the top slicked back and terminating in a "notch" suggestive of a ponytail.  Guzman said defendant was wearing black slacks and a black t-shirt.  The passenger was wearing a "black tank with . . . cutoff sleeves and a white shirt underneath."

Rivas testified he has poor distance vision and his memory of the incident was "foggy."  He testified the driver wore a black and red shirt and had hair that was shaved on the sides and slicked back on the top.  Rivas did not get a good look at the passenger.

An occupant of one of the parked vehicles began a "hostile conversation" with Guzman and Rivas and appeared to Guzman to be trying to start a fight.  Guzman and Rivas continued past the vehicles on their way home, but defendant made a U-turn, stuck

---

[5]    The house belonged to one of defendant's friends, who was a documented member of the Asian Crips.

[6]    Guzman identified defendant and his vehicle in photo lineups.

4

his head out the car window, and said, "This is my hood," and "This is my set," before driving off to a nearby cul-de-sac.

Rather than cross defendant's path at the cul-de-sac, Guzman and Rivas waited for about 10 minutes in a vacant field off of Parkdale Avenue. From there, they saw defendant's vehicle pull straight out of the cul-de-sac and into the middle of Parkdale Avenue, before reversing back out of sight into the cul-de-sac. A few seconds later, Guzman saw defendant get out of his car,[7] walk into the middle of Parkdale Avenue, assume a "shooting stance," ask "What's up cuz,"[8] and fire four or five rounds toward Guzman and Rivas with a black, "heavier caliber" revolver. Guzman and Rivas fled toward a park behind the field and told the park occupants to get down. When Guzman turned around, defendant was gone. A neighbor called the police.

Guzman believed the incident occurred when it was still light outside, "[m]aybe 4:00." Rivas believed it was "[a]bout" evening. Based on dispatch evidence, police estimate the shooting occurred between 6:50 and 6:54 p.m.[9]

### D. *July 23, 2013*

On July 23, 2013, defendant loaned his car to Thanh Nguyen, an Asian Crip gang member, while defendant was working.[10] A few minutes later, one of Nguyen's friends

---

7    Rivas testified he thought it was the passenger.

8    Guzman understood defendant's reference to "cuz" to be associated with Crip gangs. Detective Tews corroborated this.

9    For purposes of the new trial motion, defense counsel stipulated the shooting occurred around 6:45 or 6:50 p.m.

5

called defendant to inform him that police had stopped Nguyen and might impound the vehicle because Nguyen did not have a driver's license. Defendant left work and walked to where Nguyen had been pulled over. When defendant arrived, he identified himself to a police officer as the owner of the vehicle and informed the officer he was on felony probation. Defendant was searched and placed in the back of a police car with Nguyen. Police searched defendant's vehicle and found a loaded .357 magnum revolver hidden behind a loose panel. During a surreptitiously recorded conversation between defendant and Nguyen in the back of the police car, defendant apologized to Nguyen "for bringing it." Police arrested defendant.

## II. *Defense Case*

Defendant testified in his own defense. He said, "[t]echnically speaking in the gang world" he is not an official member of the Asian Crips because he had never been "jumped in"; he acknowledged, however, that "reality wise"—that is, "[t]o the average person"—he is "considered a gang member." He also admitted to having previously been convicted of three felonies relating to credibility.

Defendant admitted he fought Jorge on April 9, but asserted Jorge instigated it. Defendant claimed he was unaware Jorge had been stabbed.

Defendant denied shooting at Guzman and Rivas on May 28. According to defendant, he worked until 5:00 p.m. that day at a fast-food restaurant in Mira Mesa. After work he went home and then to the home of his girlfriend, Abigail Relos.

---

10    Defendant knew that Nguyen intended to use the car to visit his probation officer and then to buy drugs.

6

Defendant did not stay at Relos's house for long because they got into an argument when defendant caught her smoking marijuana, which he did not approve of. At 5:53 p.m., Relos sent defendant a text message telling him to "[b]e safe . . . nigga." Defendant then went to his friend Cassandra Tutay's house, about a 10- or 15-minute drive from the scene of the shooting. Defendant testified he did not know the exact time he arrived at Tutay's house, but knew it "was still sunlight," so he estimated it was "anywhere from 6:30 to 7:30." Defendant said he stayed at Tutay's until he had to be back at work for a midnight shift. Defendant admitted that at the time of the shooting he owned a white 1997 two-door Honda.

On cross-examination, defendant acknowledged it would have been important to have an alibi witness corroborate his timeline testimony. When the prosecutor asked why defendant had not subpoenaed Tutay for that purpose, defendant responded, "At the time I asked the investigator if they can call. They said that they weren't able to get in contact with her. So I wasn't able to subpoena her."[11]

Regarding the July 23 offense, defendant admitted he and Nguyen purchased the gun together. Defendant said he bought it "[j]ust to have one." Defendant acknowledged he knew at the time he purchased the gun that he was not permitted to have one.[12]

---

[11] The prosecutor reminded jurors during closing argument that defendant had not called Tutay to corroborate his alibi.

[12] Defendant also admitted he violated a condition of his probation that prohibited him from associating with Asian Crip gang members.

Defendant also called an expert on eyewitness identification who testified about the difficulties in identifying strangers, particularly across racial lines.

### III. *Jury Verdict*

In connection with the April 9 stabbing, the jury found defendant guilty of robbery (Pen. Code,[13] § 211) and assault with a deadly weapon (§ 245, subd. (a)(1)). The jury found true the gang enhancements alleged in connection with these counts.

Regarding the May 28 shooting, the jury found defendant guilty of two counts each of attempted murder (§§ 187, subd. (a), 664) and assault with a firearm (§ 245, subd. (a)(2)). The jury found true the gang enhancements alleged in connection with these counts. The jury also found true the allegations that a principal discharged a firearm in connection with the attempted murder counts, but did not find true the allegations that defendant personally did so.

The jury also found defendant guilty of possession of a firearm by a felon. (§ 29800, subd. (a)(1).)

### IV. *New Trial Motion*

Following the verdict, defendant moved for a new trial on the basis his trial counsel had been ineffective by failing to adequately investigate several potential alibi witnesses.[14] Although defendant had mentioned at trial only Relos and Tutay as people he encountered on the evening of May 28, his new trial motion asserted that there was a

---

[13]     Undesignated statutory references are to the Penal Code.

[14]     The new trial motion asserted other bases of ineffective assistance of counsel, but defendant does not raise those on appeal.

8

birthday barbecue hosted at Tutay's house that evening and that several additional alibi witnesses could now vouch for his whereabouts.

The trial court held an evidentiary hearing in January and February of 2015 during which it received live testimony from defendant's trial counsel, defense investigators from various stages of the case, Detective Tews, and defendant's putative alibi witnesses. We summarize their testimony as follows.

## A. *David Berman*

David Berman was appointed defendant's replacement counsel before trial. He arranged to have John Ballard serve as his investigator. Berman testified that before he first met with defendant he had received investigative files from defendant's previous counsel and his investigator (Frank Griffin) about two alibi witnesses (Relos and Tutay) and "probably" discussed it with defendant during their meeting (though he had no specific recollection of having done so). Berman also received copies of text messages that were downloaded from defendant's phone; he did not specifically recall reviewing them, but said he "would normally do that."

Berman testified Ballard had reported to him that defendant said he had alibi witnesses who would lie for him. Based on this, Berman believed he was ethically barred from pursuing Relos and Tutay as alibi witnesses. He nonetheless directed Ballard to attempt to contact them, but recalled Ballard was unable to do so. Based on his concern over the alibi witnesses' veracity and Ballard's inability to locate them, Berman made the expressly "tactical decision" not to pursue an alibi defense. Instead, his "primary" focus was attacking the shooting victims' eyewitness identifications of defendant.

9

Berman added that he is generally skeptical of alibi defenses "unless you have an ironclad government stamped basis to present it," and thinks juries don't like alibi defenses. In his 46 years as a criminal defense attorney, Ballard had successfully asserted an alibi defense only once. Further, based on his training, experience, and continuing education, Berman testified his "general sense is that the criminal defense community is fairly negative about alibi defenses in general." Accordingly, Berman testified that even if Ballard had been able to locate Relos and Tutay, he would still have been disinclined to assert an alibi defense.

Berman explained he was also concerned about Relos's youth and the fact her timeline "wouldn't provide a full account . . . for [defendant's] whereabouts," which is "critical." Berman recalled generally there were also "problems" with Tutay's story, but he did not recall specifics.

Despite the fact Berman questioned Relos's and Tutay's veracity with respect to defendant's whereabouts on May 28, Berman explained he allowed defendant to testify at trial because Berman "felt that as the defendant he had a right to testify on his own behalf. Only he knows what the truth is and that was good enough for [Berman]." Berman reiterated, "I didn't know that [defendant's testimony] was untrue." However, Berman noted he had concerns about defendant's veracity based on conflicting accounts of who owned the gun police found in his car on July 23 (discussed further below). All in all, Berman summarized, "At that point in the trial I felt that if we had a reasonable chance of success with the jury, they would have to hear from [defendant]. He wanted to

10

testify, and I certainly wasn't going to prevent him from doing that. So I thought there was more to be gained than lost."

B. *John Ballard*

John Ballard testified he has been a licensed private investigator for 40 years, and had worked with Berman on about 15 cases. During Ballard's first full interview of defendant, Ballard explained he had seen reports from defendant's prior counsel about potential alibi witnesses for the May 28 shooting, but explained the chances of an alibi defense were "very slim" because the witnesses did not fully account for defendant's whereabouts. Defendant's own accounting of his whereabouts also had problems. Defendant told Ballard the only people at Tutay's house were defendant, Tutay, and Tutay's mother (Rita).

When Ballard confronted defendant about the fact that Relos and Tutay did not provide concrete statements about the timing of defendant's travels and that defendant's own timeline had him arriving at Tutay's house *after* the shooting, defendant responded: " 'Both of the girls like me a lot and they'll say—they'll testify as to whatever you tell them to testify to. [¶] . . . [¶] Whatever you and Mr. Berman tell them to say, that's what they'll say.' " Ballard notified Berman of this statement. They shared the concern that if they called Relos and Tutay as witnesses, they might break down on the stand and admit they were told what to say.

After that, the potential alibi defense "was kind of put to the side"—it was not vigorously pursued by defendant, his father, Berman, or Ballard. Ballard testified he nevertheless attempted to contact Relos and Tutay by phone and left them messages, but

11

admitted he "didn't try that hard" due to his concerns about their veracity and the need to prioritize among other tasks. Ballard "think[s]" he also left a message for Rita. Ballard noted Relos had changed her phone number and defendant agreed to provide her new number but never did. Ballard testified he believed defendant had "sabotaged his case" by maintaining excessive contact with the witnesses from jail.

Ballard testified Berman did not completely rule out the alibi defense until "shortly before trial when another instance of . . . a friend lying for the defendant came up . . . ." Defendant "consistently" told Ballard the gun found in his car on July 23 "definitely" belonged to Nguyen, as proven by a handwritten letter from Nguyen that defendant presented to Ballard during their first full interview. However, shortly before trial, Berman and Ballard saw a translation of the surreptitiously recorded police car conversation during which defendant apologized to Nguyen " 'for bringing it.' " Defendant admitted to Ballard, " 'truthfully, it was my gun . . . . [¶] I apologized to Nguyen because I shouldn't have had it in my car.' " But defendant added, " 'Don't worry. Mr. Nguyen will testify to whatever you tell him to testify.' "

Ballard followed up with Nguyen, who stated the truth " 'doesn't matter' " because he was willing " 'to take full responsibility' " for the gun—" 'defendant had told [Nguyen] that [Nguyen] couldn't get in any trouble [be]cause [Nguyen] had already done the time' " for possession of the gun. When Ballard explained to Nguyen that he could still be punished for perjury, Nguyen admitted the gun was defendant's and volunteered the fact defendant had apologized to him for it in the police car.

12

Ballard immediately informed Berman of his conversation with Nguyen. Ballard asked about following up with the Relos and Tutay (for whom he had prepared subpoenas), but Berman said not to because it would be "devastating" if they were to "fold in court like Mr. Nguyen did. [¶] . . . [¶] Definitely I do not want the girls to even come close to the courthouse." Instead, Berman and defendant decided defendant would testify and take responsibility for the gun to garner credibility with the jury.

### C. *Frank Griffin*

Investigator Frank Griffin testified that defendant told him in a jail interview that there were "a couple of ladies" he had seen the evening of May 28. Defendant did not indicate there was any type of gathering at Tutay's house; he only mentioned Tutay and her mother being there.

Griffin interviewed Relos and Tutay. He said he had no problem contacting Relos and that she was cooperative.

Tutay "was a little harder to get ahold of," but was also cooperative. When Griffin asked Tutay if anyone else was at her house on May 28, she identified only her mother; she did not mention a party or barbecue. Tutay told Griffin in August 2013 that she had not spoken to defendant since his July 23 arrest.

Griffin never interviewed Rita.

### D. *Abigail Relos*

Abigail Relos testified she did not recall being contacted by Ballard, and claimed to have returned calls from every investigator who called her. She said she told Griffin in September 2013 that defendant arrived at her house around 6:00 or 6:30 p.m. on May 28.

13

When Griffin followed up about one month later, Relos told him that on May 28, defendant's hair was slicked back and he was wearing blue jeans and a white shirt.

Relos clarified at the hearing that when defendant's current investigator (Robert Greenleaf) contacted her in August 2014 and showed Relos her May 28 text messages with defendant, she then realized defendant must have actually arrived at her house around 5:00 p.m. and left 15 to 30 minutes later. She explained she wrote "[b]e safe . . . nigga" in one of the messages because defendant was "mad" that she was high from smoking marijuana and he "went to go on foot patrol in the hood." Relos claimed "foot patrol" simply meant "walking around, getting his mind off things."

Relos denied being an Asian Crip gang member. She explained that photographs posted to her social media account showing her dressed in gang attire and throwing up gang signs were for Halloween. However, she admitted that other people in some of the photographs were Asian Crip gang members. Detective Tews testified at the hearing that he personally documented Relos as a member of the Asian Crips.

### E. *Cassandra Tutay*

Cassandra Tutay testified defendant arrived at her mother's house around 6:00 or 6:30 p.m. on May 28. She remembered the date because it was the day after her first airplane ride on a trip home from South Carolina, and they were celebrating her brother's birthday. She said the party was not planned: "I just came back like the day before, and so I was like: Oh, it's my little brother's birthday. Let's have a little barbecue for him and that was it." When Tutay found out it was also the birthday of defendant's friend, Alejandra Quach, Tutay told Quach, "Oh, you can come over . . . as well."

14

Tutay testified she cooperated with Griffin when he contacted her in August 2013. She told Griffin she had not been in touch with defendant since his arrest the prior month. However, on cross-examination, she admitted she had been in touch with defendant "a couple" times. In fact, she admitted defendant ordered her the day after his arrest to "put people on foot patrol," which she understood to mean "put other Asian Crip gang members on the street looking for enemies." She told defendant she would. She admitted that what she had told Griffin about not having contact with defendant "was not true."

Tutay acknowledged she never told Griffin about a gathering at her house, and had identified her mother as being the only other person present the day of the shooting. The first time she remembered there being a gathering was when investigator Greenleaf brought it up during an August 2014 interview.

Tutay testified she told Griffin in a follow-up interview that defendant was wearing blue jeans and a white shirt at the barbecue, and had his hair slicked back. She said "he always packs a backpack with his clothes."

Tutay said she did not recall ever being contacted by Ballard. She acknowledged she moved to Washington state and changed her phone number in September 2013, and changed her phone number again in early 2014. She stated the only people who had her new number were her mother, brothers, and Quach.

Tutay admitted that her brother, Amanance, who was involved in the April 9 stabbing, is an Asian Crip gang member; she denied that her husband is. She also

15

admitted her "mom is known by a number of Asian Crips as 'Mom Rita,' " and it was common for Asian Crips to hang out at her house.

Detective Tews testified that Tutay's brother and husband were both documented Asian Crip gang members. Tews considers Tutay a gang "associate."

## F.   *Rita Medina*

Rita testified she did not know what time defendant arrived at her house on May 28 because she did not have a watch; however, because it was still daylight she estimated it was between 5:00 and 6:00 p.m. She remembered the date because it was her son's birthday and because Tutay was getting ready to leave on a trip to North or South Carolina. Rita acknowledged Quach attended the party, but was not being honored—"[s]he was just there."

Rita said Greenleaf was the only investigator who contacted her about this case. She told him she "was not sure" what time defendant had arrived on May 28—"it could have been between 3:00, 4:00 and 5:00." She remembered defendant was wearing a white shirt, but also had his work clothes with him. Rita said defendant's hair was not slicked back.

Rita denied knowing her son was an Asian Crip gang member; denied her house was a hangout for Asian Crips; denied she was ever in a dating relationship with Lor (the driver in the April 9 stabbing incident); and would not opine as to whether several youths depicted in photographs were Asian Crips (though she did acknowledge they were throwing up gang signs).

16

Detective Tews testified he considers Rita an associate of the Asian Crip gang. Amanance is her son, and she was in a dating relationship with Lor, both of whom were gang members and were involved in the April 9 stabbing. Tews said he has seen Asian Crips at Rita's home, and has "seen her in literally hundreds of photographs with other Asian Crips gang members drinking, smoking, [and] hanging out." He said Asian Crip gang members refer to her as "Momma Rita."

## G.  *Alejandra Quach*

Alejandra Quach testified she is defendant's "good friend," but has never dated him. Beginning a few weeks after defendant's arrest, she has visited him weekly in jail, and spoken with him by phone every week or every other week.

Quach said May 28 was her birthday and she attended a barbecue at Rita's house. She estimated her memory of the barbecue was about 65 or 70 percent. She testified defendant arrived around 2:30 or 3:00, and she did not know what time he left. She did not recall what defendant was wearing. Quach recalled texting defendant on May 27 about meeting at Chuck E. Cheese on May 28; the texts do not mention a May 28 barbecue.

Quach testified Greenleaf is the only investigator who contacted her. She said she understood the importance of a potential alibi defense, but made no effort to come forward until—she claims—she approached defendant's counsel during trial.[15]

---

15    Berman testified he had no recollection of this.

## H.  *Drahcir Marfil*

Drahcir Marfil testified she is defendant's friend and Quach's best friend.  Marfil said defendant was already at Rita's house on May 28 when she arrived around 6:00 p.m. Marfil said the occasion was a barbecue to celebrate Quach's birthday.  Marfil said she, Tutay, and Rita "were planning it for a long time."

Marfil testified Greenleaf is the only investigator who contacted her.

Marfil denied being an Asian Crip gang member, but admitted her boyfriend is one.  She claimed that a hand gesture she was making in photographs was "just a heart," and not gang signs.  Marfil texted defendant in April 2013 to thank him for beating up an Asian Insane Boy gang member.  She has written and visited defendant a few times in jail.  Detective Tews testified he personally documented Marfil as an Asian Crip gang member.

## I.  *Detective Tews*

In addition to the witness-specific testimony noted above, Detective Tews also testified to three instances in the preceding eight to 10 months in which Asian Crip gang members intended to present false alibi witnesses in criminal prosecutions.

## J.  *Robert Greenleaf*

Robert Greenleaf testified he interviewed "all the girls" identified as potential alibi witnesses.  He said Rita told him she did not recall what time defendant arrived on May 28, only that it was daylight.  Rita also told Greenleaf she did not recall what defendant wore that evening.

18

Greenleaf testified Marfil told him she did not recall what time defendant arrived on May 28, nor did she tell him defendant was already at the barbecue when she arrived.

## K.  *Trial Court's Ruling*

After hearing evidence, the trial court denied defendant's new trial motion.  The court found Berman "had an idea of what [Relos and Tutay] would testify to based upon [their] earlier interview[s]."  The court gave the following explanation for why it found Berman reasonably believed Relos's and Tutay's testimony would have been false:

> "[P]reliminarily I'm going to say as a credibility call I believe based on the totality of the circumstances, meaning not only the testimony of the investigator [for] Mr. Berman, but also the testimony that came out during the course of the trial.  I firmly believe that [defendant] did tell the investigator for Mr. Berman what the investigator repeated in court.  I believe there's a reasonable belief on the part of the investigator, and therefore from Mr. Berman that the testimony that would have been elicited would have been potentially—not potentially—it would have been perjury, and that they would fall apart on the stand is what they said.

> "That's not based just on what happened when they testified but, again, in terms of I had the opportunity to watch your client testify during the course of the trial, and based upon that, I believe that is totally true."

The court was also persuaded by Berman's assessment that the alibi witnesses "may be easily discredited or . . . could cause more harm than good."  The court concluded "deference needs to be given to trial counsel in making strategy decisions." On the whole, the trial court found "that Mr. Berman's decision was within the range of reasonable competence."

The trial court also found defendant had not met his burden of showing he had been prejudiced by any alleged ineffective assistance.

19

After it denied the new trial motion, the trial court sentenced defendant to a total term of 41 years.

## DISCUSSION

### I. *Applicable Law*

Ineffective assistance of counsel is a valid ground for a new trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583.) On appeal from the denial of a new trial motion based on a claim of ineffective assistance, we defer to the trial court's factual findings if supported by substantial evidence, and we exercise de novo review over the ultimate issue of whether defendant's constitutional rights were violated. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.)

To establish a claim of ineffective assistance of counsel, a defendant must show: (1) trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) the defendant suffered prejudice, i.e., there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694 (*Strickland*); *People v. Carter* (2003) 30 Cal.4th 1166, 1211 (*Carter*).) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; *Carter*, at p. 1211.) A counsel's deficient performance results "in prejudice to defendant in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*People v. Andrade* (2000) 79 Cal.App.4th 651, 659-660.) "A

defendant must prove prejudice that is a ' "demonstrable reality," not simply speculation.' [Citation.]"  (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

In examining whether a defendant met his burden on the first prong, we give great deference to counsel's reasonable tactical decisions.  (*People v. Hinton* (2006) 37 Cal.4th 839, 876.)  A defendant must establish that the challenged act or omission did not result from an informed tactical choice within the range of reasonable competence.  (*People v. Pope* (1979) 23 Cal.3d 412, 425.)  There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and to rebut this presumption the record must affirmatively disclose that counsel had no rational tactical purpose for his or her act or omission.  (*Ibid.*; *People v. Jones* (2003) 29 Cal.4th 1229, 1254.)  "[I]f the record contains no explanation for the challenged behavior, [the] court [must] reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . .'  [Citation.]"  (*People v. Cudjo* (1993) 6 Cal.4th 585, 623.)

To establish ineffective assistance based on an alleged failure to investigate, a defendant "must prove that counsel failed to make particular investigations and that the omissions resulted in the denial of or inadequate presentation of a potentially meritorious defense."  (*In re Sixto* (1989) 48 Cal.3d 1247, 1257.)  " ' "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." ' "  (*In re Thomas* (2006) 37 Cal.4th 1249, 1258.)

21

Appellate courts must refrain from second-guessing trial counsel, since " ' "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." ' " (*Ibid.*)

II. *Analysis*

Berman expressly testified his decision not to further pursue alibi witnesses was a tactical one. So long as that decision was reasonably informed, Berman's representation of defendant was not deficient. (*In re Thomas, supra*, 37 Cal.4th at p. 1258; *In re Branch* (1969) 70 Cal.2d 200, 212-213 (*Branch*).) On this record, we conclude Berman's decision was reasonably informed.

First, Berman's concerns about witness veracity were reasonable. The trial court made a "credibility call" that defendant did, in fact, state to Ballard that Relos and Tutay would "say whatever [defendant] want[ed] them to say." Therefore, the court found Berman held a "reasonable belief . . . that the testimony that would have been elicited . . . . would have been perjury." Berman's belief was reasonable. (See *People v. Spirlin* (2000) 81 Cal.App.4th 119, 126-127 ["counsel has no duty to call witnesses who will testify untruthfully [citation] and in fact 'has an ethical obligation not to present perjured testimony' "].) Berman's belief was reinforced on the eve of trial—while subpoenas were still prepared for Relos and Tutay—when he learned that defendant

22

knowingly sought to have Nguyen falsely take responsibility for the gun.[16]  Thus, defendant's own conduct created Berman's reasonable concern that his alibi witnesses would testify untruthfully.  (See *People v. Riel* (2000) 22 Cal.4th 1153, 1217 [Although "[a] ' "lawyer should not conclude that testimony is or will be false unless there is a firm factual basis for doing so[,] [s]uch a basis exists when . . . the client's own statements indicate to the lawyer that the testimony or other evidence is false." ' "].)

*Branch, supra*, 70 Cal.2d 200, is instructive in this regard.  Before being sentenced on his conviction for having knives in his prison cell, Branch "told his attorney he could get two fellow convicts to testify they had placed the knives in his cell." (*Id.* at p. 206.) Because Branch did not mention names, his attorney " 'got the impression that he'd search around until he found a couple of people who would do what he wanted.' " (*Id.* at p. 207.)  Believing that any witness Branch presented would perjure himself, the attorney declined to investigate the defense.  (*Id.* at p. 211.)  The California Supreme Court concluded that because the defense attorney "had good reason to believe the testimony . . . would be perjured" (*ibid.*), he was "justified in refusing to act upon the proffered testimony without even investigating its veracity" (*id.* at pp. 212-213).  In light of the trial court's similar finding here that defendant's alibi witnesses' testimony "would have been perjury," we conclude Berman was likewise justified in not further pursuing the alibi defense.

---

16    It was only after the Nguyen incident that Berman said he did "not want the girls to even come close to the courthouse."

23

Second, Berman opined that alibi defenses are disfavored—by him, the criminal defense bar, and jurors—"unless you have an ironclad government stamped basis to present it." In that vein, Berman (and Griffin's interview reports) noted Relos and Tutay were not specific and "wouldn't provide a full account . . . for [defendant's] whereabouts," which is "critical." Further, Relos's testimony would not have accounted for defendant's whereabouts at the time of the shooting; to the contrary, her statement to Griffin (of which the court found Berman was generally aware) and her text message warning defendant to "[b]e safe . . . nigga" (which Berman did not specifically recall reviewing but said he "would normally do") put defendant leaving her house well before the shooting.

As for Tutay, Berman received copies of defendant's recorded jail calls, during one of which—as Tutay admitted—defendant gave her orders to put Asian Crip gang members on foot patrol. Similarly, Ballard expressed concern that defendant had "sabotaged" his case by maintaining excessive contact with the witnesses.

The trial judge found Berman's concerns about Relos and Tutay "fall[ing] apart on the stand" was reasonable. On this record, we will not second-guess that finding. (See *In re Thomas, supra*, 37 Cal.4th at p. 1258.)

Despite his concerns, Berman did not completely abandon the alibi defense. He directed Ballard to contact Relos and Tutay—the witnesses defendant identified *before* trial (as opposed to those he first identified *after* trial). Although Ballard admitted he "didn't try that hard," under the circumstances—including the fact Griffin had already

24

interviewed Relos and Tutay twice, and Berman had Griffin's interview reports—we conclude Berman's investigative efforts did not fall below the standard of care.

Defendant argues Berman overstated his claimed concerns over Relos's and Tutay's veracity, as evidenced by the fact he allowed defendant to testify to the same alibi he was unwilling to allow Relos and Tutay to establish. We are satisfied with Berman's explanation: he needed to balance his circumspection regarding defendant's veracity against defendant's constitutional right to testify in his own defense—there was no countervailing consideration regarding the other witnesses. And contrary to defendant's suggestion that Berman failed to take adequate precautions to ensure defendant would not commit perjury, the record shows defendant's alibi testimony was quite vague; he only purported to "[r]oughly" account for his time, estimating he arrived at Tutay's house between 6:30 and 7:30 p.m. This did not provide a perfect alibi—defendant could have committed the shooting and still arrived at Tutay's by 7:00 p.m.

In sum, defendant has not met his burden of showing that Berman's expressly tactical decision not to pursue an alibi defense fell outside the range of reasonable competence.

Even if Berman's handling of the alibi defense rendered his representation ineffective, we would find no prejudice because the putative alibi witnesses had significant credibility issues.

Relos's hearing testimony (1) did not account for defendant's whereabouts at the time of the shooting; (2) contradicted the timeline she initially gave to Griffin; (3) established she was high when defendant arrived at her house; (4) revealed that when

25

defendant left her house he was mad and was going on "foot patrol" in Mira Mesa, which strongly supports the conclusion defendant was involved in the shooting; and (5) showed she associated with Asian Crip gang members. And although Relos denied being an Asian Crip gang member herself, Detective Tews testified he personally documented her as such.

Tutay's hearing testimony (1) revealed she lied to Griffin about her contacts with defendant; (2) showed she never mentioned any May 28 gathering to Griffin; (3) established she had strong ties to the Asian Crip gang through her brother and mother; (4) revealed defendant had given her gang-related orders from jail; (5) conflicted with her mother's testimony about whether her memorable airplane trip was before or after May 28; (6) conflicted with Marfil's testimony about whether the barbecue was planned or unplanned and in whose honor it was being held; (7) established defendant always had a backpack with a change of clothes, which may account for differing descriptions of his attire on May 28; and (8) showed she had changed her phone number several times and moved, which may account for Ballard's difficulty in reaching her. In addition, Detective Tews testified Tutay is an associate of the Asian Crip gang.

Rita's hearing testimony conflicted with (1) defendant's own timeline; (2) what she initially told investigator Greenleaf; (3) Tutay's testimony about her travel dates; (4) Quach's testimony about the purpose of the barbecue; (5) Relos's and Tutay's description of defendant's hairstyle; and (5) Detective Tews's testimony regarding the nature and extent of her relationship with Lor and the Asian Crips.

26

Marfil's hearing testimony (1) conflicted with defendant's own timeline; (2) conflicted with Tutay's testimony about the planning and purpose of the barbecue; (3) showed she had thanked defendant for beating up a member of another gang; and (4) showed she had visited defendant in jail. Although Marfil denied she was an Asian Crip gang member, she admitted her boyfriend is one, and Detective Tews testified he personally documented Marfil as one.

Quach's hearing testimony (1) conflicted with every other defense witness's testimony regarding what time defendant arrived at the barbecue; (2) provided no estimate of what time he left the barbecue; (3) offered no assistance regarding defendant's attire; (4) showed that her May 27 text messages with defendant about plans for May 28 made no mention of any barbecue; and (5) showed she communicated with defendant extensively following his arrest.

In addition to these witnesses' own credibility issues, Detective Tews testified regarding his own recent experiences with Asian Crip gang members attempting to present false alibi witnesses in criminal prosecutions.

Because defendant's putative alibi witnesses frequently contradicted themselves and each other, and had close ties to defendant and his gang, defendant has not shown there is "a reasonable probability that, but for counsel's [asserted] unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694; *Carter, supra*, 30 Cal.4th at p. 1211.)

27

DISPOSITION

The judgment is affirmed.

HALLER, Acting P. J.

WE CONCUR:


O'ROURKE, J.


PRAGER, J.*

---

\*    Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.